**GENERAL RADIO COMPANY, a Corporation, Plaintiff,**

v.

**Robert C. WATSON, Commissioner of Patents, Defendant.**

**Civ. A. No. 4459-56.**

United States District Court
District of Columbia.

Feb. 12, 1960.

Robert H. Rines, Boston, Mass., and Nelson H. Shapiro, Washington, D. C., for plaintiff.

C. W. Moore, United States Patent Office, Washington, D. C., for defendant.

MORRIS, District Judge.

This is an action brought under 35 U.S.C. § 145 [1] by the plaintiff, as the assignee of an application for patent by one of its electrical engineers, Gilbert S. Smiley, for "Method of and Apparatus for Improving the Stability of Continuously Adjustable Transformers and the Like," Serial No. 221,878, filed April 19, 1951, seeking to have the Court authorize the issuance to it of a patent. After the final rejection by the Patent Office exam-

1. *Civil action to obtain patent.* An applicant dissatisfied with the decision of the Board of Appeals may unless appeal has been taken to the United States Court of Customs and Patent Appeals, have remedy by civil action against the Commissioner in the United States Dis-

iner on February 15, 1955, of claims 15 and 23 through 33, the applicant filed on May 10, 1955, a proposed amendment substituting claim 34 for all such rejected claims. On May 17, 1955, the examiner refused allowance of claim 34, but entered it only for purposes of an appeal. The Board of Appeals (hereinafter referred to as the Board) on June 18, 1956, affirmed the examiner's refusal of claim 34, the single claim before this Court, and which reads as follows:

"34. A variable-impedance autotransformer having, in combination, a copper-wire single-layer substantially toroidal winding wound in successively disposed turns about an annular core to provide along the exterior of the winding a track extending across the successively disposed turns, there being bonded to the turns along the track coatings selected from the group consisting of gold, platinum, palladium, rhodium, silver and nickel, means for connecting the winding to a source of voltage, the winding being adapted to be connected also with a load circuit to exchange current with the load circuit at values not greater than a predetermined safe value above which the winding would become damaged by such exchange of current, and a carboniferous or graphitic resistive brush actuable along the track in contact with the coatings and adapted for connection with the load circuit, the width of the brush being greater than the distance between two successive turns of the winding in order that the brush may establish contact with the coating bonded to a turn before breaking contact with the coating bonded to the adjacently disposed turn with which it last contacted,

thereby to prevent interruption of the current in the load circuit into the brush, means for connecting a point of the winding and the brush to the load circuit, and the brush being rotatable about the axis of the toroidal winding along the said track in engagement with the coatings of the successively disposed turns, the coatings maintaining the resistance between the brush and the track, during passage of the current of the predetermined safe value between them, substantially constant."

The invention claimed herein consists of plating gold, platinum, palladium, rhodium, silver and nickel to the turns along the brush track of the device disclosed in application No. 2,009,013, of Karplus, et al., dated July 23, 1935 (of which plaintiff is also assignee, and which device has been manufactured and sold by it under the trade name of Variac, and by its licensees in this country and others under differing trade names, for many years), and of the discovery of the reason for the failure of the Karplus device, stated in the application as follows:

"It has been found, however, that when the apparatus is in continuous use, particularly at elevated temperatures and in regions where industrial vapors or other corrosive influences are present, the copper track detrimentally oxidizes, contaminates and corrodes, markedly and rapidly increasing, and thus rendering unstable, the resistance of the brush-to-copper-track interface. With long periods of continuous use, indeed, a progressively destructive cycle is often initiated in which the increasing oxidation, contamination and corrosion of the track during the use of the instrument increases the brush-to-track resistance which,

trict Court for the District of Columbia if commenced within such time after such decision, not less than sixty days, as the Commissioner appoints. The court may adjudge that such applicant is entitled to receive a patent for his invention, as specified in any of his claims involved in the decision of the Board of

Appeals, as the facts in the case may appear and such adjudication shall authorize the Commissioner to issue such patent on compliance with the requirements of law. All the expenses of the proceedings shall be paid by the applicant.

in turn, further increases the temperature at the contact between the brush and track, which still further increases the oxidation, contamination and corrosion, until failure or improper operation of the instrument results from the high temperature."

The original autotransformer, on which Karplus was issued a patent, operated satisfactorily when used almost exclusively in laboratories, where the use was intermittent and the atmosphere clean. During and after World War II the transformer was employed more and more in industrial use, where the use was continuous and the atmosphere was contaminated. Then complaints became more and more frequent because the autotransformers were being burned out. Many methods were employed to eliminate or reduce these failures: The customers were instructed to keep the brush tracks cleaned by removing carbon particles and washing with carbon tetrochloride, the brushes were redesigned, the heat radiators were redesigned, in 1946 a beryllium-copper brush spring was employed to obtain a uniform spring pressure on the brush, which lost tension under the "hot spot" temperature in the region of the brush, and which was substituted in 1949 with a stainless steel brush spring, efforts were made to cool the auto-transformer by blowing air on it, using a blower and a fan, and by oil cooling, pigtails, or conductors, were employed to carry the current from the block containing the carbon and to help carry the heat out of the block. All these efforts, it was testified, delayed the eventual burn-out of the tracks, but were not successful in preventing their ultimate destruction by such burn-out. In order to save face with its customers, plaintiff eventually supplied considerably larger instruments than the size indicated by the need of the customer. Mr. Smiley, whose assignee plaintiff is respecting the application here involved, testified that in 1948 (Tr. 86):

" * * * we began to suspect that there was an action occuring that we hadn't been able to explain by ordinary—these techniques that we said, the track got dirty from the brush, got dirty from contamination—but there seemed to be something more, and at that time I began to suspect that there was a formation of a high-temperature oxide, the cycle being initiated by some chance or haphazard occurrence, but once that cycle had been initiated it was a destuctive, a vicious circle of oxide forming, poor contact, more heat, more oxide, and this was the cause of burnout.

"So, the first thing we thought was to keep air away from the area around the brush and the track. At that time the Dow Corning Company announced a high-temperature silicone grease, and we tried it, and it seemed to help; it wasn't perfect, but it certainly delayed burnout, and so we recommended it to our customers who were having burnout trouble."

In addition to the above efforts to correct the apparent inherent destructive quality of the apparatus, attempted improvements in the iron core, around which the copper-wire forming the brush track was wound, were made in an effort to improve the thermoconductivity so as to lower the temperature of the "hot spot" and thereby reduce the total amount of heat generated in the transformer. This latter effort also failed to result in a solution of the problem. At this stage of developments, Mr. Smiley testified (Tr. 92–94):

"It occurred to me that since we— no matter what we tried to do we were getting this progressive high-temperature oxidation of the track, and this was a phenomena associated with copper, that if we could use some other metal than copper, it might be possible to find a metal that would work. And, naturally, I think anybody who is familiar with metals knows that such materials as gold and platinum and silver might be expected to work. However, they

are extremely expensive materials. This is a commercial product. You wouldn't expect to wind a transformer like this with gold or platinum or even silver wire, and be able to sell it for the same price that you sell one wound with copper wire.

\* \* \* \* \* \*

"I finally thought if possibly [sic] we could apply some metal other than copper to the brush track, and brush track only—that portion of the wire which was bared for contact with the brush—it might be possible to prevent this destructive cycle.

\* \* \* \* \* \*

" \* \* \* We had thought that the brown copper oxide, the type that forms on a penny—an old penny—was a good thing because it interposed at this point where we want the resistance—it interposed a fairly stable uniform resistance. In fact, when we would manufacture these the insulation and part of the copper was [sic] removed by a grinding operation. When they were bright and shiny they very often would show on our tests too low a resistance, and we have a test that shows that at the brush-to-copper interface.

"Our standard procedure then was to put the transformer aside a week or two—sometimes a month. The track would oxidize with this normal, low-temperature oxide, and they would pass the test and we would ship them out."

There can be no question but that the method discovered by Mr. Smiley, employed by plaintiff, and described in the application constitutes a marked improvement over the original patented device, especially when employed in industrial plants, and that it has completely overcome the failure difficulties inherent in the original device for such use. Depositions of a number of plaintiff's customers were to this effect, as was testimony of employees and an officer of

plaintiff. Plaintiff's competitor licensees in this country and elsewhere have adopted and employed the method in their products, and plaintiff has been issued a British patent thereon. Indeed the Board did not deny the commercial acceptance and the obvious success of the method discovered by Mr. Smiley, and affirmed that "the problem of transformer failure under certain adverse conditions or operation was an illusive matter for some period of time," and that the "problem of transformer failure was not found until an extensive research program was conducted." The Board, however, thought the problem recognized and solved by plaintiff was basically the same as the problem recognized and solved by Sedgfield, British Patent No. 620,284, dated March 22, 1949, relating to "wire-wound potentiometers" and having "for its object the provision of means for preventing the development of contact irregularities due to corrosion or tarnishing of the contacting portions of such devices." This object is accomplished in the patent by "plating with a metal which is both corrosion—or tarnish-resistant and hard enough to give a good wearing surface to the "winding of insulated resistance wire whose insulation is removed from adjacent turns to form a track for the wiper" of such potentiometer. The wire of the winding is disclosed as "resistance wire of any desired type."

On July 17, 1956, plaintiff filed with the Board a motion to remand to the primary examiner and motion for reconsideration or rehearing, in which it was stated it had arranged by sending one of its attorneys to Europe to obtain an affidavit of Mr. Robert Hayes Nisbet, named in the British patent cited as a reference, which affidavit would be transmitted to the Board promptly upon its receipt. On October 22, 1956, the Board refused the request to remand because its rule that affidavits submitted after appeal will not be admitted without a showing of good and sufficient reasons why they were not earlier presented had not been satisfied.

At the trial in the instant proceedings plaintiff introduced into evidence the deposition of the British patentee, Colonel Hugh Sedgfield, and that of his attorney who prepared the patent, Mr. Robert Nisbet. The Solicitor of the Patent Office was also present at the taking of such depositions and cross-examined Colonel Sedgfield.

The plaintiff has set forth in an appendix to its brief numerous dissimilarities in the devices involved in its application and in the Sedgfield patent, which are substantially reproduced below.[2]

| 2. Plaintiff's Power Autotransformer | Sedgfield Fine-Wire Potentiometer |
|---|---|
| *Kind of Device and Purpose* | |
| 1. Device for supplying electric power. (P.Ex. 1, Tr. 45–51) | 1. Delivers no power and would be inoperative as potentiometer if it did. Provides an electrical signal representing position of gyroscope. (Tr. 219–220) |
| 2. Copper winding employed. | 2. Resistance wire winding employed. The Board cited Shoemaker, Patent No. 2,398,333, dated April 8, 1943, to show that Sedgfield wire "may be" copper, but certainly it could have no such practical use: "It is possible to use copper for a heating coil, but in the normal sense a resistance wire would not generally be a copper wire. Copper has got a low resistance. You would make a fortune if you could produce copper without any resistance." (P.Ex. 2, p. 22) "In theory a potentiometer can be manufactured using copper wire, but it would |

2.—Continued

| Plaintiff's Power Autotransformer | Sedgfield Fine Wire Potentiometer |
|---|---|

### Kind of Device and Purpose—Cont'd

|  | be excessively inconvenient—one would have to use a tremendous length of copper—and in practice potentiometers are wound with resistance wire and not with copper." (P.Ex. 2, pp. 29–30) "I see no reason why it ["resistance wire of any desired type" specified in Sedgfield patent] should be copper wire." (Tr. 227) Resistance wire cannot be used in autotransformers. |
| 3. Carbon, resistive, heatable brush bridging two adjacent turns. (P.Ex. 1, Tr. 58) | 3. Small metal non-resistive wire wiper contacting single turn. (P.Ex. 2, p. 7, P.2D, Tr. 220) |
| 4. Brush held against track under spring pressure. (Tr. 76–78) | 4. Delicate, lightest possible contact of small wire wiper essential. (Tr. 220, P.Ex. 2, p. 12) |
| 5. Heavy induced circulating current in turn of winding bridged by resistive brush that contributes to heating when autotransformer delivers power. (P.Ex. 1, Tr. 60–63) | 5. No induced circulating current and no power delivered. (P.Ex. 2, p. 35) |
| 6. Must have a definite finite resistance between brush and track to prevent short-circuiting the circulatory current, which resistance cannot be too low and not too high, and which also must be constant. Plaintiff's discovery of plating employed to keep the resistance constant. (P.Ex. 1, Tr. 60–63, 250–251, P.Ex. 2, p. 35) | 6. The lower the resistance between wiper and track, the better. Sedgfield invention employed to keep contact resistance constant. (P.Ex. 2, p. 13–14, 36, Tr. 250–251) |

### Circumstances of Operation

| 7. Operates in industrial and other uncontrollable areas. (P.Ex. 1, Tr. 53, 265, 268–272) | 7. Operates under controlled conditions with gyroscope. (Tr. 220–221) |
| 8. Operates with heatable resistive brush pressing against track in fixed position for long periods of time. (P.Ex. 1, Tr. 53, etc.) | 8. Operates with fine wire wiper barely touching track and continually moving back and forth. (Tr. 238–239, P. Ex. 2, pp. 17–18, 33–36) |
| 9. Develops very high temperatures and high-temperature copper oxide, "hot spot" under the fixed carbon brush. (P.Ex. 1, Tr. 53, etc.) | 9. Operates at low room temperature or slightly above. Never develops high temperatures or high-temperature oxide under moving wiper. (Tr. 238–239, P.Ex. 2, pp. 17–18, 33–36) |

### Difficulties

| 10. Because of carbon brush pressed in fixed position against copper track, low-temperature oxides or the like and other "contact irregularities" of Sedgfield create no problem, but are desirable to provide the required brush-to-track resistance. (Tr. 94, 229–231, 241) | 10. "Contact irregularities" such as "bumps" formed by low-temperature oxide, corrosion or tarnish or the like, which interfere with "good contact," which is essential, between wiper and track. These "contact irregularities" or "bumps" cause the wiper to "chatter" as it moves back and forth, creating erratic signals. Sedgfield patent provided corrosion— and tarnish-resistant track at room temperature to prevent this difficulty. (P.Ex. 2D, Tr. 250) |

2.—Continued

| Plaintiff's Power Autotransformer | Sedgfield Fine-Wire Potentiometer |

### Difficulties—Cont'd

11. Would short-circuit and be inoperative if a low resistance "good contact" between brush and track were employed. Needs a bad or resistive contact of finite value to prevent short-circuit. (Tr. 60–63)

11. Good contact with lowest possible resistance necessary. (P.Ex. 2D, Tr. 250)

12. Does not require hard wearing surface and, in fact, uses soft surface since carbon brush acts as a lubricant. (Tr. 229)

12. Must have hard wearing surface on track. (P.Ex. 2D, Tr. 250)

13. Discovered that high temperature copper oxide was cause of a destructive burn-out cycle that rapidly increased the resistance between brush and track by generating more high temperature, producing further high temperature high-resistance copper oxide, generating more heat, etc., until burn-out (P.Ex. 1, Tr. 86–89)

13. No high temperatures, no high-resistance or runaway-resistance high-temperature copper oxide, and no burn-out. (Tr. 238–239, P.Ex. 2, pp. 17–18, 33–36)

14. Burn-out problem resulting from runaway resistance between brush and track as a function of time as brush *fixedly* engages one point on track. (P.Ex. 1, Tr. 53, etc.)

14. Non-analogous open and closed "chatter" contact problem resulting from low-temperature tarnish particles or wear on track as wiper *moves* back and forth therealong. (Tr. 223–224, 228, 253)

### Solutions and Non-Solutions

15. Gold and platinum on autotransformer copper track under carbon brush found satisfactory to prevent formation of high temperature copper oxide and the destructive burn-out cycle, thus entirely satisfactory solution. (P.Ex. 1, Tr. 242)

15. Gold and platinum on potentiometer track unsatisfactory solution because of excessive wear. (P.Ex. 2D, Tr. 232, 242)

16. Silver found satisfactory to prevent formation of high-temperature copper oxide and the destructive burn-out cycle, and thus entirely satisfactory solution. (P.Ex. 1, Tr. 95–96, 243)

16. Silver unsatisfactory since it tarnishes at room temperature and is soft. (P.Ex. 2, p. 19, Tr. 243)

17. Nickel found satisfactory to prevent formation of high-temperature oxide and the destructive burn-out cycle, and thus entirely satisfactory solution. (P.Ex. 1, Tr. 97, 244)

17. Nickel unsatisfactory since it tarnishes at room temperature and is soft. (P.Ex. 2, p. 19, Tr. 243)

18. Chromium unsatisfactory in halting burn-out. (P.Ex. 1, p. 10, Tr. 243)

18. Chromium satisfactory since both hard and resistant to room-temperature corrosion and tarnish. (P.Ex. 1—letter dated March 15, 1955, Tr. 243)

19. Rhodium satisfactory in view of the discovery that, under a carbon brush at elevated temperatures, it prevents formation of high-temperature copper oxide and does not itself form a high-temperature deposit that initiates a burn-out cycle (not because of its properties of hardness and room- or low-temperature tarnish-resistance). (P.Ex. 1, Tr. 244)

19. Rhodium satisfactory in view of its hardness and the fact that it does not tarnish at room or low temperatures. (Tr. 240–244)

886

From this list of dissimilarities, it is readily discernible that, while the plating of the contact tracks of each device resolved the difficulty in each, and such plating in each instance was done to make the contact resistance (between resistive carbon brush and copper track in plaintiff's autotransformer and between non-resistive metal wiper and metal track in the Sedgfield potentiometer) constant, there was quite a difference in the underlying problem in each which made such plating and constant resistance necessary. Plaintiff's need for a constant resistance was to prevent *high-temperature* copper oxide, contamination and corrosion from causing a destructive burn-out cycle which rapidly increased the resistance between brush and track by generating more high temperature, which generated further high temperature, high-resistance copper oxide, which generated more heat, et cetera, until burn-out resulted. The need for a constant resistance in the Sedgfield device was to prevent *low-temperature* corrosion or tarnish or the like from causing "contact irregularities" or "bumps" which caused its delicate wire wiper, while moving back and forth along the track, to "chatter," and make erratic electrical contact, and thus to provide erratic electric signals for correcting the flight of aircraft.

The low-temperature oxide, which was detrimental to and the problem respecting the Sedgfield device, is beneficial in plaintiff's autotransformer, which needs a bad or resistive contact of finite value to prevent short-circuiting. Only one of the metals, rhodium, found to be effective for plating the Sedgfield device is also effective for plating plaintiff's autotransformer, and the unqualified expert testimony was that Sedgfield's teaching that rhodium would not tarnish or corrode at low- or room-temperature, while operated under controlled conditions, does not teach that rhodium will not corrode or oxidize under the high temperature created by the carbon-to-copper contact of plaintiff's autotransformer while operated in industrial and other uncontrolled areas. I am of opinion that plaintiff's method of solution, as set forth in its application, a very important part of which was the discovery of the problem inherent in the Karplus autotransformer when employed in industry as opposed to a laboratory, is patentable over the cited references of Karplus, et al., Shoemaker and Sedgfield.

The Patent Office Solicitor introduced the additional reference of the prior art as taught by statements contained in the Hunt textbook, Electrical Contacts, published in May 1946.[3] Out of context and

3. 1. "Copper, brass * * * cannot be regarded as suitable materials for contacts in applications where a low contact resistance is required. Even at room temperature a sufficiently thick film forms on copper in a few hours to increase the contact resistance many times as compared with that obtained with chemically clean contacts." (p. 17, mid-page)
2. "As already indicated, the principal characteristics affecting contact selection are tendency to the formation of tarnish or corrosion films and resistance to electrical wear, the latter being related to hardness, melting point and thermal conductivity.
3. "Film formation will cause increased contact resistance, and can lead to a vicious spiral of increasing temperature rise and increasing film formation. In this connection therefore the relative tendency of each material to form oxide, sulphide or other films under varying conditions should be appreciated." (p. 73, lines 4 through 11)
4. "Copper, which is widely used, has the advantage of possessing high thermal conductivity and high specific heat, but has serious limitations in another respect which make it unsuitable for contactor contacts as conditions increase in severity. It is liable to severe over-heating owing to the formation of a high-resistance oxide film, a vicious circle being set up as the temperature rises, causing further oxidation and still greater rise of temperature. Such overheating leads to increased electrical wear and to welding of the contacts. Even on light duties, however, it will be found that silver shows a considerable advantage over copper, particularly where operation is not frequent, and the long idle periods give rise to films of copper oxide." (p. 50, last eleven lines)
5. "Overheating of the contacts can be prevented almost entirely by the use of

at first blush, these statements would appear to teach that plaintiff's problem and solution would have been obvious to one skilled in the art. However, as explained by Mr. Smiley on cross-examination by the Solicitor of the Patent Office, and on redirect examination, all the statements relate to low-temperature, metal-to-metal contacts, such as the problems involved in the Sedgfield patent. At the trial, the Solicitor read yet another statement from Hunt dealing with rhodium (the only metal which works satisfactory in both plaintiff's application and the Sedgfield patent):

> "Rhodium is even more inert chemically to most reagents than platinum, but it may tarnish if heated to high temperatures in air."

Hunt does not deal with autotransformers, copper-to-carbon resistive contacts, nor does Hunt disclose the cause of the burn-out difficulties experienced in the autotransformers. If Mr. Smiley had followed Hunt's teachings that rhodium tarnishes "if heated to high temperatures in air," that platinum is even less "inert" than rhodium, and that silver can only be used "where operation is not frequent," he may never have tried these metals for the solution of the very high-temperature burn-out problem.

With reference to the Patent Office Solicitor's characterization of Mr. Smiley's testimony as self-serving, the Court was impressed with both the integrity and ability of the witness. If the Patent Office wishes to discredit expert or lay testimony, the obvious method would be to provide witnesses for that purpose.

For the reasons stated, I am of the opinion that there is lacking a rational basis for the finding by the Board, and the Commissioner of Patents will be authorized to issue to plaintiff a patent for the invention as specified in claim 34.

Counsel will prepare an appropriate order to carry into effect this decision.

fine silver. The usual procedure is to insert a facing of silver, of the order of one-sixteenth inch in thickness, into the copper contact by silver brazing, the size of facing depending upon the area over which contact is made." (p. 51, lines 12 through 17)

6. "At normal temperatures rhodium is not attacked by any known reagent and is completely immune from tarnish. An oxide forms, however, at temperatures between 600 and 800°C. The use of rhodium as a contact material is chiefly represented by electrodeposited coatings * * *." (p. 79, midpage)

7. "The application of rhodium for contact purposes is chiefly represented by electrodeposition methods. * * * Rhodium is a very hard white metal, entirely free from oxidation or tarnish at ordinary temperatures, and possessing remarkable resistance to wear * * *." (p. 93, midpage)

8. "It [platinum] is completely immune from oxidation or tarnishing at all temperatures or in any environment which is likely to be encountered, and in this respect can be regarded as a standard to which all other contact materials can be referred." (p. 18, lines 13 through 16)

9. "The exceptional corrosion resistance of platinum has made it of paramount importance where a constant contact resistance is essential." (p. 77, lines 4 and 5)

10. "Platinum can be electrodeposited quite readily, but is not widely used as better characteristics are provided by rhodium in almost every case where platinum could be used." (p. 93, lines 1 through 3)

11. "Rhodium can be deposited directly on to silver, gold, copper, nickel, brass, nickel-silver, phosphor-bronze, berryllium-copper and similar alloys, but not on to tin, lead, zinc, cadmium, aluminum, iron, or steel. Where one of these is present a preliminary deposit must be applied, preferably of silver. (p. 95, line 11, et seq.)