**SUPERIOR ELECTRIC COMPANY,**
Plaintiff,

v.

**GENERAL RADIO CORPORATION,**
Defendant.

Civ. A. No. 870.

United States District Court
D. New Jersey.
May 15, 1961.

Shanley & Fisher, Newark, N. J., by Frank L. Bate, Newark, N. J., and Stephen H. Philbin (New York Bar), New York City, Ernest M. Junkins (Connecticut Bar), Bridgeport, Conn., of counsel, for plaintiff.

Harry B. Rook, Newark, N. J., Rines & Rines (Massachusetts Bar), Boston, Mass., of counsel, for defendant.

WORTENDYKE, District Judge.

This action is for a declaratory judgment, 28 U.S.C. §§ 2201 and 2202, that defendant's United States Patent No. 2,949,592 (Smiley) is invalid and not infringed. Plaintiff (Superior) is a corporation of the State of Connecticut, with an established place of business in that State. Defendant (General) is a corporation of the State of Massachusetts, with an established place of business in New Jersey. Jurisdiction rests upon 28 U.S.C. §§ 1338(a) and 1332(a).

General counterclaims for infringement and for unfair competition by reason of Superior's copying of the design of the housings in which General's autotransformers are enclosed. Issue has been duly joined upon the questions of validity, infringement, and unfair competition.

The patent in suit issued only after an adjudication by the United State District Court for the District of Columbia, in General Radio Corp. v. Watson, rendered on February 12, 1960, upon an opinion reported in 188 F.Supp. 879, which authorized the Commissioner of Patents to issue the patent after the Board of Appeals had affirmed the Examiner's rejection of the applicant's single claim.

In the present action General has moved for a preliminary injunction restraining Superior from:

(1) manufacturing, using or selling variable autotransformers embodying the invention described in the claim of the patent; and

(2) unfairly competing with General by selling such autotransformers in cases or housings of novel and distinctive, non-utilitarian design, style and with general features which the movant claims have come to acquire a distinctive secondary meaning indicative of General as the sole source or origin thereof.

In support of and in opposition to the pending motion numerous affidavits and exhibits have been submitted, with briefs in behalf of each of the parties, and the motion has been duly argued.

The grounds urged for General's claim for injunctive relief are:

(1) The validity of the patent in suit has been adjudicated in General Radio v. Watson, supra;

(2) Upon the documents and exhibits before this Court Superior's variable autotransformers clearly infringe General's patent claim; and

(3) Superior's autotransformer housings are slavish copies of those of General which have acquired a distinctive meaning as products of General, so that their use by Superior constitutes unfair competition with General on Superior's part.

In opposing the motion, Superior contends that the patent is invalid for want of invention, and is not infringed. Superior argues that General has not shown adequate grounds for preliminary injunctive relief upon the issues of validity and infringement of the patent. Superior denies that its housings unfairly compete with those of General, and asserts that General is precluded from obtaining a preliminary injunction by reason of laches, and for lack of a showing of irreparable injury.

The patent in suit was issued August 16, 1960, upon the application of Gilbert Smiley, filed April 19, 1951, and General is the owner of the patent. The patented device is described as an adjustable transformer with stabilized contact track, and contains the single claim of "a variable-impedance auto-transformer[1] having, in combination, a copper-wire single-layer substantially toroidal winding wound in successively disposed turns about an annular core to provide along the exterior of the winding a track

1. A transformer is a form of induction coil used in alternating current systems of electrical distribution by which a current of high potential is transformed to one of lower potential, or vice versa. An autotransformer is a transformer with only one coil for transforming voltages or currents. A variable autotransformer is one used to adjust (select) voltages or currents.

extending across the successively disposed turns, there being bonded to the turns along the track coatings selected from the group consisting of gold, platinum, palladium, rhodium, silver and nickel, means for connecting the winding to a source of voltage, the winding being adapted to be connected also with a load circuit to exchange current with the load circuit at values not greater than a predetermined safe value above which the winding would become damaged by such exchange of current, and a carboniferous or graphitic resistive brush actuable along the track in contact with the coatings and adapted for connection with the load circuit, the width of the brush being greater than the distance between two successive turns of the winding in order that the brush may establish contact with the coating bonded to a turn before breaking contact with the coating bonded to the adjacently disposed turn with which it last contacted, thereby to prevent interruption of the current in the load circuit into the brush, means for connecting a point of the winding and the brush to the load circuit, and the brush being rotatable about the axis of the toroidal winding along the said track in engagement with the coatings of the successively disposed turns, the coatings maintaining the resistance between the brush and the track, during passage of the current of the predetermined safe value between them, substantially constant."

The patent specifications state that the claimed invention is an apparatus "for rendering stable, over long periods of time, the resistance between movable brush contacts and portions of conductors engaged by the brush contacts," and that the device is useful in combination with a continuously adjustable auto-transformer as described in United States Patent No. 2,009,013, issued July 23, 1935 to Karplus & Tuttle (Karplus). The alternating-current apparatus disclosed by Karplus was a transformer in which a movable contact member is employed to vary either the voltage or the usable portion of a winding by making successive connections to a series of points at different electrical potentials without interrupting the circuit. In the language of claim 1 of Karplus, "the winding * * * (is) designed to exchange current with the (external) circuit at values not greater than a predetermined safe value above which the winding would become damaged by such exchange of current, * * * the value of the resistance of the contact member being such that when the contact member makes simultaneous contact with two adjacent points, at the time of the exchange of said predetermined, safe current between the winding and the external circuit, the geometric mean [2] of the resistances of the contact to said adjacent points is not less than about one-third and not greater than about three times the voltage between said adjacent points divided by said predetermined, safe current."

Both parties to the present proceeding cite Rosenberg v. Groov-Pin Corp., 2 Cir., 1936, 81 F.2d 46, which holds that a decree in a suit against the Patent Commissioner holding an applicant entitled to have the patent issue is insufficient to support a preliminary injunction against infringement of the patent. In the Rosenberg case, Judge Learned Hand stated, at page 47:

"Examiners have neither the time nor the assistance to exhaust the prior art; nothing is more common in a suit for infringement than to find that all the important references are turned up for the first time by the industry of a defendant whose interest animates his search. It is a reasonable caution not to tie the hands of a whole art and there is at least the added assurance which comes from such an incentive. If that be the basis of the rule, as we believe it should be, suits under section 63 of title 35, United States Code (35 U.S.C.A. § 63), will not

2. The geometric mean is the square root of the product of two given numbers.

serve when the Commissioner is the only defendant. They might be well enough prima facie to establish the validity of the patent over such references as the examiner chances to find, but they should no more establish invention than the grant itself."

Section 63 is now section 145 of Title 35.

 Neither the briefs submitted upon this motion nor the Court's independent research discloses any support for the proposition that the decision in General Radio Corp. v. Watson, supra, is *res judicata* between the parties to the present suit. That the District of Columbia decision enhances the presumption of validity, which arose upon the issuance of the patent, is well-recognized. Indeed, the incisiveness of the analysis made and the soundness of the conclusion reached by Judge Morris are strongly persuasive to this Court of the validity of the patent in suit. While the mere aggregation of a number of old elements which in the aggregation perform no different function than that theretofore produced by them is not patentable invention, Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58, "elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, * * *." Great Atlantic & Pac. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. See E. I. M. Co. Inc. v. Philadelphia Gear Works, Inc., 5 Cir., 1953, 205 F.2d 28; Oliver United Filters, Inc. v. Silver, 10 Cir., 1953, 206 F.2d 658; Jeoffroy Mfg. Inc. v. Graham, 5 Cir., 1953, 206 F.2d 772.

Obviously plaintiff should not be enjoined from continuing to manufacture its autotransformers unless they infringe defendant's patent. Therefore, the granting of such a preliminary injunction would require an adjudication that the plaintiff's device does so infringe. In effect, therefore, the present motion seeks the equivalent of a summary judgment of validity and infringement. F.R.Civ.P. 56(c) 28 U.S.C. permits a summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Glagovsky v. Bowcraft Trimming Co., 1 Cir., 1959, 267 F.2d 479. If the judgment in General Radio Corp. v. Watson, supra, has eliminated any right to question the validity of the Smiley patent, whether it is being infringed by the plaintiff is an additional issue in this case, upon which the litigants would be entitled to a plenary trial, unless infringement conclusively appears upon the pleadings, and answers to interrogatories presently before me. Also in issue is the charge of unfair competition made by General against Superior. Upon this issue, as well as upon those of validity and infringement, the parties are entitled to a plenary trial unless no genuine dispute appears. Cf. Howard Industries, Inc. v. Rae Motor Corporation, 7 Cir., 1959, 267 F.2d 430.

██ The motion before me invokes the exercise of my sound discretion. Injunctive relief such as the defendant here seeks should be granted cautiously and only in a clear case. Movant has failed to show that it will suffer irreparable injury pending the trial if a temporary injunction is denied at this time. There is no status quo for the preservation of which preliminary injunctive relief would, in the circumstances of this case, be justified. The existing status of the parties and their mutual interrelationship have existed for a long period of time, and will continue until final judgment, without the aid of an injunction. It has not been shown, with that degree of clarity required, that the withholding of a preliminary injunction will be more damaging to the moving party than to the respondent.

F.R.Civ.P. 52(a) requires that in refusing an interlocutory injunction, the Court shall set forth the findings of fact and conclusions of law which constitute

**344**

the grounds of its action. We proceed, therefore, to outline the evidence submitted upon the present motion.

The nature, objects and method of functioning of the device described in the patent in suit have been fully explained by Judge Morris in General Radio Corp. v. Watson, supra. That Court found that "the method discovered by Mr. Smiley, employed by plaintiff (there General), and described in the application, constitutes a marked improvement over the original patented (Karplus) device, especially when employed in industrial plants, and that it has completely overcome the failure defects inherent in the original device for such use." Among the prior art patents relied upon by the examiner, in his initial rejection of the application, was British Patent No. 620,-284, issued to Sedgfield, dated March 22, 1949, for wire-wound potentiometers, the object of which patent was to prevent the development of contact irregularities due to corrosion or tarnishing of the respective contacting portions of the wiper and the track in the described device. Sedgfield taught the accomplishment of this object by plating with a metal which was resistant to both corrosion and tarnishing, and which was hard enough to give a good wearing surface to the track upon which the wiper moved. Included in the report of the opinion in General Radio Corp. v. Watson are photographs of the devices of General Radio and of Sedgfield respectively, with a parallel-columnar tabulation of the dissimilar features and characteristics of each device for purposes of comparison. The Court pointed out at page 886 of the 188 F. Supp. opinion that:

" * * * while the plating of the contact tracks of each device resolved the difficulty in each, and such plating in each instance was done to make the contact resistance (between resistive carbon brush and copper track in plaintiff's autotransformer and between non-resistive metal wiper and metal track in the Sedgfield potentiometer) constant, there was quite a difference in the underlying problem in each which made such plating and constant resistance necessary. Plaintiff's need for a constant resistance was to prevent *high-temperature* copper oxide, contamination and corrosion from causing a destructive burn-out cycle which rapidly increased the resistance between brush and track by generating more high temperature, which generated further high temperature, high-resistance copper oxide, which generated more heat, et cetera, until burn-out resulted. The need for a constant resistance in the Sedgfield device was to prevent *low-temperature* corrosion or tarnish or the like from causing 'contact irregularities' or 'bumps' which caused its delicate wire wiper, while moving back and forth along the track, to 'chatter,' and make erratic electrical contact, and thus to provide erratic electric signals for correcting the flight of aircraft. The low-temperature oxide, which was detrimental to and the problem respecting the Sedgfield device, is beneficial in plaintiff's autotransformer, which needs a bad or resistive contact of finite value to prevent shortcircuiting. Only one of the metals, rhodium, found to be effective for plating the Sedgfield device is also effective for plating plaintiff's autotransformer, and the unqualified expert testimony was that Sedgfield's teaching that rhodium would not tarnish or corrode at low—or room—temperature, while operated under controlled conditions, does not teach that rhodium will not corrode or oxidize under the high temperature created by the carbon-to-copper contact of plaintiff's autotransformer while operated in industrial and other uncontrolled areas."

With respect to the teachings of Hunt and others, cited as prior art, the Court pointed out (188 F.Supp. at page 887) that "all the statements relate to low-temperature, metal-to-metal contacts, such as the problems involved in the Sedgfield patent." The opinion further-

indicates that Hunt taught that rhodium was even more inert chemically to most reagents than platinum, but might tarnish if heated to high temperatures in air. Judge Morris adds:

"If Mr. Smiley had followed Hunt's teachings that rhodium tarnishes 'if heated to high temperatures in air,' that platinum is even less 'inert' than rhodium, and that silver can only be used 'where operation is not frequent,' he may never have tried these metals for the solution of the very high-temperature burn-out problem."

While the decision in the District of Columbia proceeding is not necessarily binding upon this Court, and would not be res judicata upon the issue of validity here presented, neither the present pleadings nor the affidavits submitted upon this motion point to any prior art other than that which was considered in General Radio Corp. v. Watson, supra, upon which the present plaintiff predicates its contention that the patent is invalid. Indeed, the allegations of the complaint cite No prior art patents, but merely aver that the Smiley device "in all its material and substantial parts, was in public use and on sale in this country more than one year prior to April 19, 1951, the date of the application on which said patent was granted."

The plaintiff, originally as a partnership and subsequently as a corporation, has been making and selling variable autotransformers since 1939. In those devices the input voltage is applied to the two ends of the single layer of copper wire which is toroidally wound about the annular magnetic core. The desired output voltage is obtained from one end of the winding and from the movable carbon brush in contact with the track formed by bared portions of the insulated wound wire. As the brush is moved along this commutating track, varying voltages from maximum to zero are selected. In 1938 Superior took a license for an autotransformer under General's Karplus patent, paying royalties thereunder until the patent expired in 1952.

On September 27, 1941, in the course of correspondence with the B-L Electric Manufacturing Company, of St. Louis, Missouri, relating to a transformer to be used in connection with special equipment for the Signal Corps Laboratories at Fort Monmouth, New Jersey, plaintiff suggested that it would "plan to silver-plate the Powerstat commutator and to use a type of brush material that will insure against the increased voltage drop with aging" which B-L Electric was desirous of overcoming. An order was obtained by plaintiff from B-L Electric on December 17, 1941 for three Powerstats of the specifications submitted, including the silver-plated commutator. These units proved unsatisfactory to the purchaser, although not because of the track plating, and were returned to the manufacturer.

On November 10, 1942 the W. Green Electric Company, Inc. complained to the plaintiff respecting the corrosion features which impaired the efficiency of plaintiff's Powerstats, which Green Electric had purchased. This corrosion resulted from the atmospheric humidity to which the Powerstats were exposed in Green Electric's business. In its letter of the stated date, Green Electric advised plaintiff that "another manufacturer of variable transformers somewhat similar to your Powerstats, has found it possible to silver-plate the exposed windings to minimize corrosion" and advised that if the plaintiff were able to offer Powerstats with windings protected against corrosion, the possibility of the use of plaintiff's products by Green Electric would increase considerably. The letter concluded with the opinion that "silver plating, if applied in a sufficiently heavy coat, would certainly be better than plain copper. We wonder whether it is practical to go a step further and use solid silver wire instead of copper." The foregoing suggestion from Green Electric evidently stimulated Superior to experiment along the lines mentioned.

On April 7, 1948, Sigmund Cohn Manufacturing Company, Inc. suggested to Superior that it would undertake to rho-

dium plate the contact surface of one of Superior's Powerstat transformers. This was done, and on June 4, of the same year, Superior reported that it had thoroughly tested the rhodium plated commutator and found that "the contact resistance between carbon and rhodium is slightly less than the contact resistance between copper and carbon," and that the Powerstat did not manifest any noticeable deterioration of the commutator surface under continuous overload. Superior ordered from Cohn the rhodium plating of one unit of each of Superior's entire line of Powerstats. This plating was performed in the presence of a representative of Superior, who reported his observations of the process under date of July 22, 1948. Further experimentation by plaintiff in rhodium plating the commutator tracks of its Powerstat continued through January 13, 1953.

The Smiley patent here in suit is claimed by plaintiff to be in all respects similar to the Karplus patent "with the addition that the bare places which constitute the commutating track are covered by gold or platinum or palladium or rhodium or silver or nickel." This is exactly what the Patent Office examiner concluded as a basis for his rejection of the single claim of the Smiley application. Upon the trial de novo under Section 145 of the statute, 35 U.S.C. § 145, the Court found that the plating of the contact track served an entirely different purpose in the Smiley device than it had served in that of Sedgfield.[3] Smiley achieved a constant resistance by preventing high temperature copper oxide, contamination and corrosion from causing a destructive burn-out cycle, while Sedgfield preserved a constant resistance by preventing low-temperature corrosion or tarnish. Smiley's objective was the avoidance of a succession of temperature increases resulting in ultimate burn-out. Sedgfield sought the prevention of contact irregularities or bumps caused by corrosion or tarnish, which created a chattering effect upon the movement of the delicate wire wiper along the track of the bared portions of the wound wire. As I understand it, Sedgfield needed an absolutely smooth surface on its track, while Smiley required an uneven or rough track surface; but both required a track absolutely free from corrosion.

Plaintiff continued to manufacture and sell unplated autotransformers while pursuing (except for war period interruption) its experiments with plating upon the commutator tracks of its autotransformers. In 1951 plaintiff shipped 100 rhodium plated autotransformers of its own manufacture, and in 1953 commenced advertising and selling plated autotransformers at the same price as the unplated type. We are told that over 100,000 of the plated autotransformers were sold in 1954, and that Superior's sales of the plated product have steadily increased during the succeeding years. Plaintiff represents that four persons who participated in the experimentation in the field of plating the tracks of autotransformers are prepared to testify upon the trial of this action.

The application for the patent in suit, however, was filed April 19, 1951. Therefore it is not disclosed that "the invention (of Smiley) was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States," 35 U.S.C. § 102(b). Plaintiff also fails to spell out unpatentability under 35 U.S.C. § 102(a), because there was no reduction to practice of the device "before the invention thereof by" Smiley. See Alexander Milburn Co. v. Davis-Bournonville Co., 1926, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651; Application of Schlittler, 1956, 234 F.2d 882, 43 CCPA 986; Stearns v. Tinker & Rasor, 9 Cir., 1955,

3. The Sedgfield (British) Patent, Number 620,284, issued March 22, 1949, upon application filed January 15, 1947, taught the plating of the track portion of wire-wound potentiometers with a metal which is both corrosion and tarnish resistant and hard enough to give a good wearing surface. Suggested plating materials to meet such requirement included rhodium and silver; the latter to be used either alone or in combination with copper.

220 F.2d 49, certiorari denied 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741.

From the exhibits annexed to defendant's answers to plaintiff's interrogatories it appears highly probable that plaintiff's "Powerstat" variable transformer infringes defendant's "Variac" transformer. The plaintiff concedes that the claim of the Smiley patent reads on the plaintiff's device. It is undisputed that during the life of General Radio's Karplus patent, No. 2,009,013, covering an unplated autotransformer, Superior Electric held a license and paid royalties until the patent expiration in 1952. The affidavit of plaintiff's president, Alfred B. Nelson, states that the autotransformers which are now being made and sold by Superior are the same as those which it manufactured and sold under the Karplus license "except that most now have coatings of rhodium or gold alloy" and are generally known as plated autotransformers, as distinguished from the nonplated type of transformer manufactured and sold under the license.

■■■■■■ The purpose of a preliminary injunction in a patent infringement suit, as authorized by 35 U.S.C. § 283, is not finally to determine the ultimate rights of the parties, but rather to protect their respective rights pending the final disposition of the litigation. Such an injunction is not intended to be used for any other purpose than to preserve the existing state of things between the litigants. Relief of this character is extraordinary in its nature, but available within the sound discretion of the Court. Whether it should be granted or withheld depends upon the peculiar circumstances of the case. Unless the factual situation appearing upon the motion for a preliminary injunction discloses the likelihood that the party seeking injunctive relief will probably prevail, such preliminary relief should be withheld. See Meccano, Ltd. v. John Wanamaker, 1920, 253 U.S. 136, 40 S.Ct. 463, 64 L.Ed. 822; Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 3 Cir., 1959, 268 F.2d 569.

Respecting defendant's claim for unfair competition it clearly appears that at least one genuine issue of fact stands unresolved. That issue is found in the question whether the housings in which the transformers of the respective parties are enclosed are so similar in structure and appearance as to create the likelihood of confusion in the minds of prospective purchasers respecting the source of manufacture of the enclosed device. A related question of fact, the resolution of which requires plenary trial, is whether the defendant's housings have acquired such a meaning in the market as indicative of the identity of the defendant as the producer, that housings of the plaintiff, generally similar in appearance to those of the defendant, are likely to mislead a purchaser into believing that he is purchasing the product of the defendant.

■■■■ This Court concludes that the exploration of the validity of the Smiley patent has not been foreclosed by the judgment in General Radio Corp. v. Watson, supra, and that although there is sufficient evidence now before this Court of infringement by the plaintiff of the Smiley invention, no such infringement can be found if invalidity of the Smiley patent is established. This Court further finds that there has been no showing upon the patent aspects of this case of such circumstances as should impel the Court to grant the extraordinary preliminary relief which the defendant seeks. The status of the respective parties will necessarily continue until the final determination of this case, without the need for temporary injunctive relief, and the defendant has failed to carry the burden of showing that it will suffer irreparable damage if such relief is not afforded. The Court is unable to determine, upon the evidence submitted on this motion, that the plaintiff unfairly competes with the defendant by using the type of housing which it has adopted for its product.

Defendant's motion for preliminary injunction will be denied, and an order may be presented in conformity with the views herein expressed.