The **SUPERIOR ELECTRIC COMPANY,** Plaintiff,

v.

**GENERAL RADIO CORPORATION,** Defendant.

Civ. A. No. 870–60.

United States District Court
D. New Jersey.
March 29, 1962.

Shanley and Fisher, Newark, N. J., for plaintiff, by Frank L. Bate, Newark, N. J. Stephen H. Philbin, New York City, New York Bar, Ernest M. Junkins, Bridgeport, Conn., of counsel, for plaintiff.

Harry B. Rook, Newark, N. J., for defendant. Rines & Rines, Boston, Mass., by Robert H. Rines, Boston, Mass., Massachusetts Bar, of counsel for defendant.

WORTENDYKE, District Judge.

The nature of this declaratory judgment action is fully disclosed in this Court's opinion, (1961) D.C., 194 F.Supp. 339, holding that the motion of defendant-counterclaimant (patentee) for preliminary injunction against plaintiff (alleged infringer) should be denied. The case has now been fully tried upon the issues of patent validity, infringement and unfair competition. This opinion is in lieu of findings of fact and conclusions of law.

United States Patent No. 2,949,592 was issued August 16, 1960, upon application filed April 19, 1951, to G. Smiley, who assigned it to the defendant, General Radio Company. The patent application was initially denied by the Commissioner, whose denial was affirmed by the Board of Appeals. General Radio then brought an action under 35 U.S.C. § 145 against the Commissioner, General Radio Company v. Watson, D.C.D.C.1960, 188 F.Supp. 879, and obtained an order authorizing the Commissioner to issue the patent. The present plaintiff, Superior Electric, was not a party to the § 145 proceeding. The decision in that case is not res judicata here, but the presumption of patent validity, 35 U.S.C. § 282, is invoked by Judge Morris' conclusion that the invention claimed is (p. 882 of 188 F.Supp.) "a marked improvement over the * * * device" taught by United States Patent No. 2,009,013 of Karplus, issued July 23, 1935, and that it was not disclosed or suggested in British Patent No. 620,284 issued to Sedgfield March 22, 1949, or taught by Hunt in his text book "Electrical Contacts", published in London, in May 1946, by Johnson, Matthey & Co. Ltd.

General Radio was assignee of both the Karplus and Smiley patents, and Superior Electric was a licensee of General Radio under the Karplus patent, paying royalties until that patent expired in 1952. Both patents relate to variable voltage autotransformers. Plaintiff's product is marketed under the trade name Powerstat; that of defendant under the name Variac.

The specifications of Karplus relate his invention to alternating-current apparatus "in which a movable contact means,

such as a contact member, is employed to vary either the voltage or the usable portion of a winding" and to "arrangements for making successive connections to a series of points at different electrical potentials without interrupting the circuit." Karplus taught the use of a resistive contact member making successive connections with points of the winding; being always in connection with at least one point, and in certain positions short-circuiting adjacent points. The resistance of the contact member was sufficiently high to substantially reduce the short circuit current, and substantially low so that excessive heat would not result from the flow of the useful current.

The specifications of Smiley incorporate by reference the description of a continuously adjustable autotransformer[1] contained in the Karplus specifications. Smiley supplements Karplus with the statement that the transformers to which his patent relates involve "[p]redetermined adjacently disposed regions of the successive turns of a conductor winding" which "form a commutating surface or track, with adjacent portions of which a carboniferous or graphitic resistive brush may engage to effect the desired voltage variation in the winding." Smiley further explains that "the brush-to-track resistance[2] should be greater than about one-third and not less than about three times the voltage effectively short-circuited by the brush between adjacent turns of the winding, divided by the safe value of load current above which the winding would become damaged."

The commutating track over which the resistive brush passed in the Karplus transformer was formed by removing the insulation from a portion of the top of each turn of the winding, thus permitting the tapping of successive voltages from the coil by moving the resistive brush-carrying arm through successive radial positions around the circumferential track formed by the bare portions of the windings. At each position the resistive brush was in contact with two adjacent windings of the coil, thus varying the voltage drawn from the transformer. Karplus relied upon the resistive capacity of the brush to limit the heat generated by the short-circuiting of two adjacent turns of the coil. In use, however, particularly in industry, it was found that protracted periods of uninterrupted contact between the movable resistive brush and the bare copper surfaces of any pair of adjacent turns resulted in the development of progressively increasing temperatures at the interface contact, which not only shortened the life of the transformer, but, in many instances, resulted in damage to the turns of the coil, destructive of the utility of the device.

Smiley describes this difficulty in the specifications of his patent in the following language: "when the apparatus is in continuous use, particularly at elevated temperatures and in regions where industrial vapors or other corrosive influences are present, the copper track

---

1. Plaintiff's witness, Nelson, described a variable voltage autotransformer as "an auto-transformer that has a movable brush that rotates on the bare part of what is called the commutator of the auto-transformer, making an output voltage that is continuously variable from zero, where zero voltage exists at one end of the coil, to completely around to the other end of the coil where the maximum output voltage exists. That is, a variable voltage transformer has in effect an adjustable tap which enables * * * the operator to pick off any voltage he may wish as he moves the movable tap along the bare section of the winding of the auto-transformer."

    *      *      *      *      *

2. When a current is established in a conductor heat is developed, and the rate at which it is developed is proportional to the second power of the intensity of the current. The proportionality factor is known as the resistance of the conductor. Resistance varies with temperature. The temperature coefficient of resistance for metals is positive; but carbon displays a negative coefficient, i. e., its resistance decreases as the temperature rises.

detrimentally oxidizes, contaminates and corrodes,[3] markedly and repeatedly increasing, and thus rendering unstable, the resistance of the brush-to-copper-track interface. With long periods of continuous use, indeed, a progressively destructive cycle is often initiated in which the increased oxidation, contamination and corrosion of the track during the use of the instrument increases the brush-to-track resistance, which, in turn further increases the temperature at the contact between the brush and track, which still further increases the oxidation, contamination and corrosion, until failure or improper operation of the instrument results from the high temperature." In other words, Smiley's "destructive cycle" is the succession, in continuous use, of increases of oxidation, build-ups of brush-to-track resistance, and progressive temperature increases at contact point, producing further increases of oxidation, resistance, and heat, and so on. Recognizing that the employment of gold, silver and other noble metals (not susceptible to these reactions) in place of copper, as material for the conductor of the coil would be economically impractical, Smiley's claimed invention disclosed conductors having "integrally bonded coatings selected from the group consisting of gold, platinum, palladium, rhodium, silver and nickel." The preferred embodiment of his invention was in the form of a winding of a variable-impedance element, such as an autotransformer, insulated except along the certain predetermined regions, with a resistive brush engaging the coated regions. In the language of its single claim, the Smiley patent here in suit teaches "[a] variable-impedance autotransformer having, in combination, a copper-wire single-layer substantially toroidal winding wound in successively disposed turns about an annular core to provide along the exterior of the winding a track extending across the successively disposed turns, there being bonded to the turns along the track coatings selected from the group consisting of gold, platinum, palladium, rhodium, silver, and nickel, means for connecting the winding to a source of voltage, the winding being adapted to be connected also with a load circuit to exchange current with the load circuit at values not greater than a predetermined safe value above which the winding would become damaged by such exchange of current, and a carboniferous or graphitic resistive brush actuable along the track in contact with the coatings and adapted for connection with the load circuit, the width of the brush being greater than the distance between two successive turns of the winding in order that the brush may establish contact with the coating bonded to a turn before breaking contact with the coating bonded to the adjacently disposed turn with which it last contacted, thereby to prevent interruption of the current in the load circuit into the brush, means for connecting a point of the winding and the brush to the load circuit, and the brush being rotatable about the axis of the toroidal winding along the said track in engagement with the coatings of the successively disposed turns, the coatings maintaining the resistance between the brush and the track, during passage of the current of the predetermined safe value between them, substantially constant." Neither Smiley nor Karplus claimed novelty in the device referred to in the Smiley claim except to the extent that there were bonded to the successively disposed turns of the winding about the annular core, along the track over which the resistive brush moved, "coatings selected from the group consisting of gold, platinum, palladium, rhodium, silver and nickel," the

---

**3.** "Oxidation is the removal of electrons from a body." Ware, Essentials of Qualitative Chemical Analyses, 1928, p. 69.

\*    \*    \*    \*    \*

"Copper forms two oxides: red cuprous oxide $Cu_2O$, and black cupri oxide $CuO$.

Both oxides are basic anhydrides, forming cuprous and cupric salts." Analytical Chemistry, 6 Ed. 1927, Treadwell (Hall) Vol. 1, pp. 2/7.

coatings maintaining substantially constant the resistance between the brush and the track during the passage of current of a predetermined safe value between them.

The evidence in this case also discloses that British Patent No. 620,284, issued to Sedgfield on March 22, 1949, upon application filed January 15, 1947, taught plating the uninsulated wiper track of a potentiometer with a metal which is both corrosion- and tarnish-resistant, and hard enough to provide a good wearing surface to prevent the development of contact irregularities on the wiper and track due to corrosion or tarnishing. The specifications of Sedgfield mention rhodium as a suitable material for the purpose stated. A potentiometer, as contemplated by Sedgfield, differs from the variable voltage autotransformer to which Smiley refers, principally, in respect to the composition, function and effect of the movable wiper or brush which travels over the insulation-free commutator track. In the potentiometer the movable wiper and the bared turn of the coil are composed of material of negligible resistance. The movable brush of the autotransformer is a highly resistant carbon which, when bridging the surfaces of two adjacent turns of the copper coil, develops heat proportionate to the resistance of the brush. A potentiometer is an apparatus for measuring galvanometrically, electromotive force or difference of potential. A transformer has been defined as a device for producing, by means of an electric current, a current of different strength and potential. When it is borne in mind that the voltage capacity of the autotransformer coil is alerted between maximum and minimum by drawing off voltages at different pairs of turns by the interposition of the resistance of the brush, the reason for the generation of high temperatures at the brush contacts, as compared with the minimal temperatures between the wiper and a turn of the coil in a potentiometer, points up the necessity for

provision in the former of means to limit temperature elevations at the contact faces.

General Radio contends in this case that the suggestion in Hunt op. cit. supra, of rhodium as a suitable material for plating electrical contacts was directed only to the elimination or limitation of tarnish and corrosion upon the commutator surfaces, while Smiley discovered that the use of rhodium for plating the surface of the commutator track in an autotransformer would limit and control the oxidation-heat-resistance-oxidation cycle which took place in such devices having unplated copper commutator tracks.

Assuming, as I find to be the case, that plating of the commutator track of an autotransformer with rhodium was known in the prior art as a means of preventing or limiting the tarnishing and corrosion of the track, did Smiley's discovery that such a means was also effective to prevent run-away heat and forestall burn-out of the turns of the coil, amount to invention? This was the question which confronted Judge Morris in General Radio Corp. v. Watson, Commissioner, supra. In comparing the teachings of Sedgfield with those of Smiley, Judge Morris pointed out that although the object of the plating taught by each was the achievement of a constant contact resistance, Smiley employed the resistance so achieved "to prevent *high-temperature* copper oxide, contamination and corrosion from causing a destructive burn-out cycle," while the objective of Sedgfield was the prevention of "*low-temperature* corrosion or tarnish or the like from causing 'contact irregularities' or 'bumps'" on the track, causal of erratic electrical contact between wiper and track. Both inventors sought constancy of resistance but for different purposes,—Sedgfield *to reduce corrosion or tarnish, and Smiley to prevent ultimate burn-out. Does the Smiley patent constitute invention over Karplus in the light of Sedgfield?* [4]

4. Smiley did not testify before me, but he did testify before Judge Morris in

the Watson case. The failure of General Radio to call Smiley as a witness in

In 1923 Chief Justice Taft, writing for the Supreme Court of the United States, in Eibel Process Company v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, at p. 63, 43 S.Ct. 322, 328, 67 L.Ed. 523, described the criteria of invention, as follows: "In administering the patent law, the court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent, to secure to the inventor the reward he deserves." In that case, the patent was concededly an improvement in the production of paper through a new and different method of using a paper-making machine by elevating the breast-roll end of the making-wire so that the paper stock travels by gravity much faster than the making-wire ordinarily runs for a certain grade of stock, and increasing the speed of the machine to such extent as to bring the rate of speed of the making-wire up to the speed of the rapidly moving stock, thereby increasing the capacity of the machine. In the language of the opinion, at p. 65, 43 S.Ct. at p. 329, the patent was construed "to cover a Fourdrinier machine in which the pitch of the wire is used as an appreciable factor, in addition to the factors of speed theretofore known in the machine, in bringing about an approximation to the equal velocity of the stock * * * [to] be produced." Further, at p. 68, 43 S.Ct. at p. 330, the opinion characterizes the invention as "not the mere use of a high or substantial pitch to remedy a known source of trouble (but) the discovery of the source not before known, and the application of the remedy, for which Eibel was entitled to be rewarded in his patent." Our research fails to disclose any later Supreme Court decision expressly overruling that in Eibel. However, the Eighth Circuit Court of Appeals, in 1959, in Caldwell v. Kirk Manufacturing Co., 8 Cir., 269 F.2d 506, 509, had this to say respecting the standards recognized at the time of its decision: "More exacting standards for determining patentable invention have been applied by the courts

the case at bar deprived Superior Electric of the opportunity of confronting him, on cross-examination, with the various aspects of the prior art relating to the subject matter of electrical contacts.

Judge Morris, in the Watson case opinion (commencing at p. 881) sets forth at length certain excerpts from Smiley's testimony, from which it appears that in *1948* he " 'began to suspect * * * that there was a formation of a high-temperature oxide, the (burnout) cycle being initiated by some change or haphazard occurrence, but once that cycle had been initiated it was a destructive, a vicious circle of oxide forming, poor contact, more heat, more oxide, and this was the cause of burnout. So, the first thing we thought was to keep air away from the area around the brush and the track.' " (It will be noted in the discussion of the testimony herein, that Nelson became aware of the cause of the burnout in *1940*, and solved the problem by plating the copper surface which excluded the air-borne oxygen from oxide-forming contact with the copper in 1941.)

Smiley also recognized that the progressive high temperature oxidation of the commutator track was a phenomenon associated with copper, and that the substitution of another metal upon the contact surface might solve the difficulty. He added that " 'anybody who is familiar with metals knows that such materials as gold and platinum and silver might be expected to work.' " Because these materials were expensive, however, he concluded that by the application of some metal other than the copper to the brush track alone, the destructive cycle might be forestalled.

The crux of Judge Morris' decision is to be found in his conclusion at p. 886 of 188 F.Supp., that "there was quite a difference in the underlying problem * * * (faced by Sedgfield and Smiley) which made such plating and constant resistance necessary." The *objective* of each, however, was identical, viz., the prevention of oxidation by the denial of atmospheric access to the copper track surface. There was no evidence before Judge Morris, of course, respecting the problems which had been confronted by Nelson and the results of his experiments leading to their ultimate solution which he achieved, prior to Smiley's realization of the nature of the *same* problem, and his commencement of experiments to solve it.

in recent years than was formerly the case." In support of this statement, the Court cites Trico Products Corp. v. Delman Corp., 8 Cir. 1950, 180 F.2d 529, where it is stated, at p. 533: "The Supreme Court has, we think, raised the standards of originality necessary to sustain patents for improvements such as those involved in the instant cases, regardless of their usefulness or commercial success." In connection with the last foregoing statement, the Court referred to the Eibel case, and suggested its comparison with Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. Cuno, supra, at pp. 91, 92, 62 S.Ct. at p. 41, went far in the direction of adhering to its reminder that "[i]ngenuity was required to effect the adaptation (of the device), but no more than that to be expected of a mechanic skilled in the art" and that "[s]trict application of that test is necessary lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art." The alleged invention involved in Cuno taught improvements in cigarette lighters commonly found in automobiles, by the addition of a thermostatic control which automatically returned the "plug" to its "off" position after the coil had reached the proper temperature. The Court characterized the alleged contribution of the inventor as a mere incorporation of the well known thermostat into the old "wireless" lighter to produce a more efficient, useful and convenient article. Adding (p. 91, 62 S. Ct. p. 41) that "the use of a thermostat to break a circuit in a 'wireless' cigar lighter is analogous to or the same in character as the use of such a device in electric heaters, toasters, or irons, whatever may be the difference in detail of design."

■ Even if it be concluded that Smiley's improvement was a new and useful discovery, we are called upon to determine whether the subject matter thereof as a whole would have been obvious at the time the alleged invention was made, to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103.

In the advisory report entitled "Possibility of interchangeable use of the materials and alloys of the platinum group, silver, tungsten, and others, in electrical contacts" made by E. M. Wise to Dr. James B. Conant, Chairman of the National Defense Research Committee of the Office of Scientific Research and Development, dated May 30, 1945, the author pointed out that electrical contact resistance is largely dependent upon the properties of the contact materials, the contact pressure, and the nature of any surface films which may be present; the latter being of extreme importance in very low voltages. The object of the report was to offer aid in selecting materials for test in newly designed equipment, and for possible substitutions. The Wise report states, at page 23: "The electrical resistivity of hard carbon is high relative to metals (circa $3 \times 10^{-3}$ ohm. cm.), but the resistivity of the graphitized variety (.9 x $10^{-3}$ ohm. cm.) is lower than the other types of carbon. Where lower resistivity is required, mixtures containing graphite and copper or silver are available. Amorphous carbon has a negative temperature coefficient of resistivity, but graphite has a small positive coefficient. This high resistivity is advantageous for some of its applications to commutators and similar devices, including variable transformers (Variacs), where the contact short circuits elements differing in potential by a volt or two." The report also discloses that silver offers advantage over copper in its resistance to oxidation in air, but silver is vulnerable to sulphur. Platinum is also mentioned as resistive to corrosion, oxidation, sulphidation, salt water and free halogens, and palladium affords comparable performance with that of platinum when used for electrical contact purposes. Tungsten is not suitable for the purpose because of its susceptibility to oxidation but may be used as an alloy with platinum, palladium or silver. Gold and high gold content alloys are reported as unsusceptible to

atmospheric tarnish but, (p. 52) "where rubbing contacts are involved rhodium plating is generally more satisfactory than gold, as rhodium plate is very hard and is not apt to gall." Rhodium is, moreover, (says the Report) particularly useful as a contact metal because it can be electro-deposited in a thin, non-tarnishing hard plate of high electrical conductivity which provides a good non-galling electrical contact when rubbed against a similar surface. But for its tendency to acquire a film known as "fog", upon exposure to atmosphere having a sulphur content and high humidity, nickel would be suitable for use in electrical resistors which are called upon to function as sliding contacts. In the bibliography annexed to the Report is a reference to "The Use of Noble Materials for Electrical Contacts" by E. F. Kingsbury, published in March, 1928. The latter publication was not placed in evidence.

Hunt, op. cit. supra, discusses the use of rhodium, together with its alloys and combinations, as a contact material suitable for certain electrical purposes. The author enumerates at p. 11, the following factors governing the contact performance and selection of various metals:

| "Chemical Properties | Tendency to formation of surface films |
|---|---|
| "Physical Properties | Hardness<br>Melting point<br>Thermal conductivity |
| "Electrical Conditions | Voltage at make and break<br>Current to be carried and interrupted<br>Operation on DC or AC<br>Inductance of circuit<br>Arc suppression |
| "Mechanical Conditions | Size and form of contacts<br>Contact pressure<br>Frequency of operation<br>Speed of make and break<br>Contact action." |

———◆———

Concerning copper, Hunt teaches that it cannot be regarded as suitable material for contacts in an application where a low contact resistance is required because (p. 17) "even at room temperature a sufficiently thick film forms on copper in a few hours to increase the contact resistance many times as compared with that obtained with chemically clean contacts. * * * When complete resistance to tarnishing and oxidation in all conditions is required, the source of contact material is limited to platinum, rhodium and gold among the pure metals, although iridium is sometimes used for special applications involving high local contact pressures. * * * " And, at p. 50: "Copper * * * has the advantage of possessing high thermal conductivity and high specific heat, but has serious limitations in another respect which make it unsuitable for contactor contacts as conditions increase in severity. It is liable to severe overheating owing to the formation of a high-resistance oxide film, a vicious circle being set up as the temperature rises, causing further oxidation and still greater rise of temperature. Such overheating leads to increased electrical wear and to welding of the contacts."

At page 93 of his work, Hunt tells us that the application of rhodium for contact purposes is effected by electro-deposition methods which achieve a very hard surface entirely free from oxidation or tarnish at ordinary temperatures and

possessing remarkable resistance to wear. The freedom of the surface from film formation makes it an excellent contact material under conditions where there is no appreciable voltage to break down such films and enables it to provide a very stable as well as a low contact resistance. The author adds (p. 94): "Stability of contact resistance is of fundamental importance in radio-frequency circuits, in which any variability or uncertainty of contact causes noise or unreliability * * *." In his table of materials recommended for electrical light-duty contacts, Hunt suggests rhodium for sliding contact use in radio frequency, DC and AC circuits, and in potentiometers.

■ Dr. Sinclair, executive vice president of General Radio, and defendant's only witness, testified concerning the "burn-out" problem which confronted his company, and stated that efforts to solve it included experiments with modifications of the composition of the carbon brush, use of a silicon grease upon the copper track in order to keep air away from the contact hot spot, and employment of "pigtails" as paths for conducting the electricity away from the brush to a radiator. These expedients mitigated but did not eliminate the difficulty. Dr. Sinclair was unable to state just when General Radio knew that there was high temperature cupric oxide at the place of the burn-out; nor was his memory of such date refreshed when confronted with the testimony of Smiley given in the District of Columbia case. The latter had testified before Judge Morris to the effect that the people in his plant were aware of the presence of cupric oxide before 1943, but that it was considered the *result* of the "burn-out" and not the *cause*. Sinclair did, however, agree with Smiley that the burn-out problem existed in Variacs from the inception of their manufacture, but that the seriousness of the problem was not critical because the Variacs were mostly used in the laboratory, and it was not until they were introduced into industrial use that the problem manifested itself in more frequent failures. Prior to World War II, the only corrective employed was the installation of a larger transformer. The application for the Smiley patent was filed on April 19, 1951, which date, in view of the absence of any evidence before me to the contrary, must bind General Radio as that of Smiley's invention.

■■ Title 35 U.S.C. § 102 provides that a person is not entitled to a patent if, before he applies therefor, the invention was made in the United States by another who had not abandoned, suppressed or concealed it. It is, therefore, the contention of Superior Electric that Nelson, its president, and his associates, discovered the subject matter of Smiley's patent prior to the date of the application therefor, and that such discovery had not been abandoned, suppressed or concealed. Commercial production is not necessary to constitute reduction to practice. One claiming to be an inventor is required to be diligent in reducing his discovery to practice after conception, but the law is not so much concerned with speed in filing application for patent, provided there is no secreting or abandonment of the invention. Abandonment must be affirmatively proved. Wietzel v. Lacy, 1930, 39 F.2d 672, 17 C.C.P.A. 943.

■ Nelson, the president of Superior, had been employed by General Radio while it was manufacturing variable voltage autotransformers under the trade name of Variacs, in 1938. He left General Radio in June of that year, and formed a partnership with one Hannon, under the name of Superior Electric Company. On August 16, 1938, the partnership took a license from General Radio under the Karplus patent, and the following year commenced to manufacture variable voltage autotransformers under the trade name of Powerstats. In August 1940, some of the Powerstats which had been manufactured by Superior and sold to Hygrade Sylvania, were returned by the purchaser for repairs rendered necessary by the "burn-out" of the copper windings of the transformer at the bare commutator track over which the movable brush operated. In the same

year, Nelson subjected the Powerstats to tests involving an approximation of the usage to which they had been subjected by Hygrade Sylvania, and discovered that copper oxide formed upon the commutator track and that the temperature of the movable brush increased with this formation. He therefore inferred that if the copper commutator track were to be silver plated, the oxidation thereof could be prevented. In *1941* Nelson disclosed his view in this regard to Professor Villard of Stanford University, and later in the same year, caused the commutator track of one of Superior's Powerstat transformer coils to be silver plated. Tests of this plated track, through use in the transformer, failed to reveal any evidence of oxide and also disclosed that the temperature of the carbon brush remained within reasonable limits. Nelson gave some consideration to the patentability of this discovery, but was advised by patent counsel that the use of the plating for the stated purpose was not patentable. Superior, however, then proceeded to silver plate its commutator tracks, and to sell these plated Powerstat autotransformers to customers, while still paying royalties to General Radio under the Karplus license. In 1942, Nelson and Hannon employed Carpenter as their chief engineer, and informed him of their silver plating experiments with the Powerstat coils. In 1945 Carpenter commenced the investigation of processes for the silver plating of the Powerstat commutator tracks. In 1946 Superior Electric was incorporated under the same name, and the following year, it employed Snowdon and assigned him to the development of the plating process for the Powerstat commutator tracks. During the course of this development, Powerstat coils were plated with chromium, rhodium, nickel and silver, and were subjected to heat-run, life and brush tests over a period extending from February 21, 1947 through June 2, 1952, under Snowdon's supervision. These tests brought Superior to the conclusion that the rhodium plated commutators would outlast those plated with nickel, as well as those which were unplated; and on April 11, 1949 the experimenters concluded that the development of "hotspot" temperatures on the unplated commutators, with the brush stationary, and under continuous load, resulted from the oxidation of the commutators. Accordingly, in May, 1949, Superior ordered equipment for a pilot plant for rhodium plating of its commutators. However, it still continued to experiment with various platings, and by January 10, 1950, had decided that the rhodium plated commutator was superior to either unplated copper or to nickel, chromium or silver plated commutators. By September of 1953, Superior's plating equipment was operating satisfactorily and, commencing with March 1954, its entire line of Powerstats was being supplied to the public with rhodium-plated commutators. Nelson's concept of plating Superior's commutator tracks was disclosed, throughout the period of its experimentation from 1941 through 1948, to various individuals and industrial concerns.

It is Superior's contention, which I find supported by the evidence adduced, that it discovered and reduced to practice silver plating in September of 1941. I also find that proof of prior public use is well established in the documentary evidence presented, as well as in the oral testimony. cf. The Barbed Wire Patent, 1892, 143 U.S. 275, 12 S.Ct. 443, 36 L. Ed. 154; and Eibel Process Co. v. Minnesota & Ontario Paper Co., supra.

Superior further contends that even if Nelson and his associates had not discovered the subject matter of Smiley's patent prior to the filing of the application therefor, nevertheless the differences between the subject matter thereof and the prior art were such that the subject matter thereof as a whole would have been obvious to a person having ordinary skill in the art to which such subject matter pertains. 35 U.S.C. § 103. In support of this contention, Superior argues that prior to April 19, 1951, when the Smiley application was filed, it was well-known that (1) copper oxidized; (2) such oxidation increased its contact re-

sistance; (3) such increase in contact resistance increased the temperature; (4) such increase in temperature increased the oxidation; (5) the oxidation of the unplated copper commutator track of a variable autotransformer of the Karplus type would, if not prevented or interrupted, terminate in the formation of black cupric oxide and ultimate burnout; and (6) plating with a nonoxidizable metal such as silver or rhodium would prevent the initiation of such oxidation process.

The evidence seems clearly to disclose that the chain of causation which Smiley claims to have discovered and overcome was well-known in the prior art. The existence and relationship of both types of copper oxides, i. e., cuprous and cupric oxides, was a matter of common knowledge. The effect of the oxidation of copper upon its contact resistivity was not new, and the relationship between resistance and heat has long been established in the electrical science. If, therefore, the formation of cuprous oxide upon a copper surface sets up a train of developments terminating in the formation of cupric oxide upon the turn of the commutator and ultimate "burn-out", it would be perfectly obvious that that ultimate result could be effectively precluded by preventing the development of the initiating causal step. Because, therefore, it was well known in the prior art that rhodium plating of a copper contact would forestall the development of oxidation, the use of such an expedient to prevent "burn-out", immediately caused by excessive resistance-induced heat, must be considered obvious to any person familiar with the field of electrical currents, conductors, contacts and resistances.

The resistivity of the carbon brush and the bare commutator track of Karplus was well-known, and the contact resistance between the brush and track was computable. The cause of the failure of the conductor after periods of continuous use under load, without change in the position of the brush, was discovered by Nelson as early as 1941. If the dis-

covery of the cause of the failure constituted invention, it was Nelson rather than Smiley who first discerned the cause and solved the problem. The experimentation with solutions for the problem in the light of the existing knowledge of electrical contacts was a matter which should not only have been obvious to a person skilled in the art, but was actually achieved before Smiley filed his application.

I am, therefore, impelled to the conclusion that the claim of the Smiley patent in suit is invalid. Therefore, plaintiff is entitled to a declaratory judgment to that effect.

■ We turn now to the allegations of General Radio's counterclaim that Superior is unfairly competing with the counterclaimant by its employment of containers or housings for its Powerstats similar in appearance and construction to those employed by General Radio for its Variacs. Among the grounds urged by General Radio for its motion for preliminary injunction was the contention that Superior's housings were of such novel and distinctive, although non-utilitarian, design, style and general appearance, that they had acquired a secondary meaning in the public mind as indicative that they contained the product of General Radio. More specifically, General Radio charged that the novel and distinctive design of Superior's housing was substantially cubicle and possessed certain other features which copied those of General Radio.

This Court refused to decide the issue of unfair competition on the motion, because of the existence of unresolved issues of fact, the determination of which was requisite to such a decision. The evidence upon the plenary trial bearing upon the issue of unfair competition presented two factual questions, viz.: (1) Were the housings so similar in appearance as to create a likelihood of confusion as to source? and (2) Had the housings of General Radio acquired a secondary meaning?

The only evidence adduced in behalf of General Radio in support of its admitted

burden of proof of unfair competition consisted of the depositions of three individuals, taken before trial, which were read into the trial record. None of these witnesses testified orally upon the trial. Each of these witnesses was familiar with the Powerstats of Superior, and the Variacs of General Radio; two of the witnesses having purchased the products of each of the parties. They stated that prior to the defendant's introduction of cube-shaped housings for its Variacs, all manufacturers of autotransformers had employed housings cylindrical or octagonal in shape. It is apparently conceded that General Radio was the first manufacturer of autotransformers to enclose its product in rectangular housings; and that this innovation in housing form was prior to the plaintiff's adoption of a similar form of housing. Each of these deposing witnesses for the defendant testified that the appearance of the square housing with rounded corners suggested to his mind that they were General Radio's housings. It was further disclosed by these deponents that General Radio's advertising was replete with pictorial representations of its box-like rounded-cornered housings as the containers within which its Variac autotransformers were marketed. Samples of the housings of each of the parties were placed in evidence. Typical are exhibits P–44 and P–47. Each houses an autotransformer enclosed in a six sided steel box. The enclosed transformer is operable in each case by a manually rotatable generally circular dial on the front face of the container. The general color of each container is gray, that which houses the Variac (P–47) is a gunmetal color, while the color of the Powerstat housing (P–44) is a lighter gray. On the front face of the Variac container, above the operable dial, is a contrasting metal plate bearing the word "VARIAC" with a stylized letter "R" in a circle immediately at the right of that name indicative of the fact that the name is registered as a trade mark. The name plate further bears the name of General Radio Company and its address, Concord, Mass., U.

S.A. There is also disclosed on the plate the type of the contained autotransformer, together with the legend "One side common to line and load" and details of line voltage, current cycles, load voltage range, and rating in amperes. Beneath the foregoing information appears "Patent Applied For". The Variac housing is approximately 4¾″ wide, 6¼″ high, 4¼″ deep without the dial handle or 5″ over all in depth. Access to the autotransformer within this housing is available by separating the two vertical halves of the housing, by removing securing screws. While the two halves of the Powerstat housing are similarly removable, more ready partial access to the autotransformer within that housing is available by the removal of a lid plate at the top of the housing. The Powerstat housing (P–44) is approximately 5½″ wide, 6¾″ high and 6″ deep without the dial handle or 7½″ over all in depth. It also has on its exterior face a dial and manually operable rotatable disk; immediately above the graduated circular plate over which the operating disk is moved, and impressed in the surface of the face of the metal housing is a stylized monogram of Superior Electric, "SE" in a diamond shaped depression. This monogram is repeated on the surface of the dial and again on the rear face of the housing. The plate or label on the Powerstat which serves a function generally similar to that on the Variac housing, is on the top surface of the Powerstat housing, and bears the name "POWERSTAT" in red letters, followed by the words "Variable Auto Transformer" and also the type, specifications, series, input voltage, current cycles, output voltage, amperage rating and maximum KVA. Along the bottom of the plate is the name of the manufacturer "The Superior Electric Co." and its address, Bristol, Conn., U.S.A. The rounded corners of both housings are, in my opinion, functional, in that they eliminate what would otherwise be undesirable sharp points and edges, and they also present a more pleasing outline of the container. The generally cubical conformation of both of these

housings enhances the efficiency and economy of packaging and storage. In that respect, both housings are superior to a cylindrical or octagonal housing, which was in common use before the adoption of the cubical form by General Radio. Both parties employ other housings, in various sizes, containing multiple autotransformers, which necessarily require a more rectangular shape than that appropriate to the cubical housing of a single autotransformer.

General Radio relies on Atlantic Monthly Co. v. Frederick Ungar Publishing Co., D.C.N.Y.1961, 197 F.Supp. 524, as support for its contention that the credibility of its three deposing witnesses upon the issue of unfair competition is equivalent to that of the witnesses who testified for the plaintiff in the cited (Atlantic) case. Because, says the defendant, the witnesses who testified to confusion in the Atlantic case were respectively the founder of the nation's largest book club, a distinguished professor of literature, and the executive of a well known retail book distributor, it follows that the testimony of defendant's three witnesses in the case at bar as, respectively, a vice-president of the nation's second largest distributor of electronic parts, a professor of electrical instrumentation at M. I. T., and the president of a well-known electrical equipment manufacturer, suffices to sustain the burden of the present defendant of supporting its contention of unfair competition in this case. This argument is indeed refreshing because of its novelty.

The Third Circuit Court of Appeals has frequently given expression to the principles governing the decision of cases of unfair competition. See e. g. Gum, Inc., v. Gumakers of America, Inc., 3 Cir. 1943, 136 F.2d 957; and Sylvania Electric Products v. Dura Electric Lamp Co., 3 Cir. 1957, 247 F.2d 730. In the Gum case, one manufacturer of bubble chewing gum charged another with unfair competition because the product of each was marketed in the form of a roll or cylinder wrapped in colored waxed paper with twisted extending ends. However, there was printed upon the wrapper of plaintiff's product in large block letters, the trade name "Blony" followed in smaller type by the plaintiff's firm name, Gum, Inc. Upon the defendant's product in correspondingly similar type appeared the name "Bubly" and the defendant's firm name, Gumakers of America, Inc. The Court of Appeals affirmed the District Court in dismissing the complaint and adopted the principle expressed by Judge Learned Hand of the Second Circuit Court of Appeals in Crescent Tool Co. v. Kilborn & Bishop Co., 1917, 2d Cir., 247 F. 299, 300, when he said that it was an absolute condition to any relief in such cases that the plaintiff " 'show that the appearance of his wares has in fact come to mean that some particular person—the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure. It will not be enough only to show how pleasing they are, because all the features of beauty or utility which commend them to the public are by hypothesis already in the public domain. The defendant has as much right to copy the 'nonfunctional' features of the article as any others, so long as they have not become associated with the plaintiff as manufacturer or source. The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward; no degree of imitation of details is actionable in its absence.' "

The defendant counterclaimant in the case before me has not shown by any of its three deposing witnesses, who were the only ones to testify in its behalf on this question, that the public was moved in any degree to buy the autotransformer of either of the parties because of its source or of any features distinguishing that source. Even if neither of the housings, typified by exhibits P–44 and P–47, bore any monogram or name plate

indicative of the identity of the manufacturer of the product within the housing, I find no feature which would induce me to relate either housing to the manufacturer of its contained autotransformer. I therefore conclude that the defendant has failed to sustain its burden of proving that the plaintiff unfairly competes with it through the use of its Powerstat housings. Therefore, plaintiff is entitled to judgment upon the unfair competition cause of action set forth in the defendant's counterclaim.

An order in conformity with the foregoing findings and conclusions may be submitted.